Daniel Lawrence YOUNG, Petitioner,

v.

State of WASHINGTON, Respondent.

Case No. C08–458–RSM.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 20, 2010.

Laura E. Mate, Federal Public Defender's Office, Seattle, WA, for Petitioner.

Gregory J. Rosen, Attorney General's Office, Olympia, WA, for Respondent.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

RICARDO S. MARTINEZ, District Judge.

### INTRODUCTION

Petitioner Daniel Lawrence Young seeks 28 U.S.C. § 2254 habeas corpus relief from his conviction for first-degree murder, and his 264–month sentence. Mr. Young asserts that he was denied his Sixth Amendment right to effective assistance of counsel when, for no strategic reason, his attorney failed to subpoena Matthew Young, petitioner's son and acquitted co-defendant. To establish ineffective assis-

tance, the petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the outcome of the proceeding. The Washington Court of Appeals denied Mr. Young's ineffective assistance claim because it found that his attorney's performance was not deficient. This Court may not conduct the two-prong ineffective assistance analysis until it determines that the state court ruling was objectively unreasonable.

For the reasons articulated below, this Court finds that the state court decision was objectively unreasonable, that Mr. Young's counsel rendered deficient assistance, and that the deficiency prejudiced the outcome of Mr. Young's trial. Accordingly, this Court GRANTS Mr. Young's petition for writ of habeas corpus, VACATES his conviction for first-degree murder, and ORDERS that Mr. Young be released from custody unless the State of Washington commences proceedings to retry him within ninety (90) days of this order.

### FACTS

It is undisputed that Matthew Young shot Shawn Tuohy. Yet Matthew[1] was acquitted of first-degree murder, under a felony-murder theory with a predicate felony of robbery, while his father, petitioner Mr. Young, was convicted of the same charge. See RCW § 9A.32.030 ("Murder in the first degree"). Father and son were tried separately, and the critical difference between the two trials was Matthew's testimony. Matthew proceeded to trial first and testified in his own defense that he shot Mr. Tuohy not in the course of a robbery but as part of a drug deal gone bad. A felony-murder theory with a predicate felony of delivery of a controlled substance would support only a second-degree murder charge, which the State did not bring against Matthew. See RCW § 9A.32.050 ("Murder in the second degree"). During Mr. Young's trial, defense counsel failed to subpoena Matthew such that Mr. Young was left without the aid of Matthew's testimony. The charge of second-degree murder was consequently dismissed, since no evidence supported it. (Dkt. # 28 [State Court Record, hereinafter "SCR"], Exh. 23, 7 Verbatim Report of Proceedings [hereinafter "VRP"] 772). Thus, the three people involved in the crime received convictions in inverse proportion to their involvement in Mr. Tuohy's death: (a) Matthew, who admitted to shooting Mr. Tuohy, was acquitted; (b) Bryce Howe, who admitted to bludgeoning and robbing Mr. Tuohy, pleaded guilty to second-degree murder without a deadly weapon enhancement; and (c) Mr. Young, who was merely present during the incident, was convicted of first-degree murder with a deadly weapon enhancement.

The Washington Court of Appeals summarized the facts as follows:

In July 2003, Daniel Young drove from Newport, Washington to a Denny's restaurant in Snohomish County with his son Matthew Young and Matthew's friend Bryce Howe. Sometime before 5 a.m., Daniel let Howe out of the car a short distance from the restaurant, and then parked his car in the Denny's parking lot. Shawn Tuohy drove into the parking lot and parked close to Daniel's car. While Daniel, Matthew and Tuohy stood in the parking lot, Howe ran toward them wearing a mask and wielding a wrench. Howe struck Tuohy, demanded money, and the two scuffled until Tuohy gave Howe $25. As Howe

---

**1.** To avoid confusion, we refer to Matthew Young as "Matthew," and petitioner as "Mr. Young."

ran away, Tuohy retrieved a gun from his car and started shooting in Howe's direction. Matthew, who also had a gun, shot at Tuohy, the bullet struck him in the head and he fell. Daniel and Matthew got into Daniel's car and drove away. Following their arrests, police found $1,060 in Matthew's possession. After Tuohy died from the bullet wound, the State charged Daniel, Matthew, and Howe with one count of first degree murder, a felony murder charge based on first degree robbery, and one count of second degree murder, a felony murder charge based on delivery of a controlled substance. The State charged a deadly weapon enhancement for each count. The trial court dismissed the second degree murder charge on the State's motion.

At trial, Howe testified that he entered into a plea agreement with the State to plead guilty to second degree murder without a deadly weapon enhancement on the condition that he testify against Matthew and Daniel. Howe testified that he and Matthew were best friends, that they often used drugs together including Oxycontin pills that they obtained from Daniel, and that Matthew asked him to come to Western Washington to help with a robbery. Howe told the jury that Matthew arranged to sell 100 Oxycontin pills for $1,100. Because Matthew did not have the pills, he intended to rob the buyer. Howe claimed that he brought his shotgun along to use in the robbery, but Daniel suggested he use a crescent wrench rather than the gun. Howe testified that that the three men took various drugs together and discussed the details of the robbery plan on the ride from Newport to Snohomish County. Howe also testified that Matthew and Daniel both spoke on the telephone at a rest stop near Denny's, presumably to get directions to the meeting place for the drug deal. Regarding the robbery itself, Howe testified that Daniel did not actually participate.

State witnesses testified that Tuohy obtained a little over $1,300 from the Moneytree the day before the robbery. Daniel did not testify, but the State played tapes for the jury and supplied transcripts of his interviews with police. Although Daniel originally claimed that he and Matthew were alone, Daniel eventually admitted that he, Matthew and Howe drove from Newport to Snohomish County, and used various drugs on the way. Daniel told police that he was not aware of any robbery plan, but that Matthew and Howe were bickering when Howe got out of the car near Denny's, and that he thought maybe Howe wanted to "get out and walk a little bit and cool himself off." Daniel claimed that he did not know anything about a drug deal, that he did not know Tuohy, and that he pulled into the Denny's parking lot to fix his muffler.

Matthew, who had been tried separately and acquitted, did not testify. At Daniel's trial, (defense counsel) informed the trial court that he had intended to call Daniel's son, Matthew, as a witness. Several weeks before trial, (counsel) talked to Matthew's attorney and understood that Matthew would be available to testify at Daniel's trial. However, just before trial, (defense counsel) learned Matthew did not intend to testify. Apparently (Matthew's attorney) advised Matthew that his testimony would not help Daniel and could create problems for Matthew, despite his acquittal. (Defense counsel) stated that he believed that Matthew had been in town two weeks before Daniel's trial, but that he had since left the state. (He) also stated that he relied on Mazzone's

earlier statement that Matthew intended to testify in Daniel's defense and did not attempt to serve Matthew with a subpoena. The State did not contest (defense counsel's) representations to the trial court and the court did not make any findings of fact.

Anticipating an appeal based on ineffective assistance of counsel, the State offered a transcript of Matthew's trial testimony and a statement from a Pend Oreille County Sheriff who attempted and failed to serve Matthew with the State's subpoena to demonstrate that "[I]f Matthew Young didn't want to be served, he wasn't going to be served anyway." Matthew testified at his own trial that he had drugs to sell to Tuohy and that he threw the drugs into some bushes after the shooting but before his arrest, Matthew said he had money with him on the trip from Newport because he had cashed his paycheck before leaving home. According to Matthew, Howe proposed and planned the robbery and Daniel and Matthew refused to participate; that Daniel did not suggest using a wrench; they dropped Howe at the freeway exit to avoid bringing a person unknown to Tuohy to the drug deal; and when they arrived at Denny's, Tuohy claimed he did not have money and asked Matthew to wait until the next day for the money.

The jury found Daniel guilty of first degree murder while armed with a deadly weapon.

*State v. Young,* 2006 WL 1064122, at *1–2 (Wash.App. Apr. 24, 2006). The Washington Court of Appeals affirmed Mr. Young's conviction but vacated the firearm enhancement and remanded for resentencing. *Id.* at *6. The Washington State Supreme Court denied Mr. Young's petition for review. (SCR, Exh. 11). The mandate

on Mr. Young's case was entered on February 16, 2007. (SCR, Exh. 12).

On February 12, 2008, Mr. Young, proceeding *pro se,* filed what was construed to be a personal restraint petition ("PRP"). (SCR, Exhs. 13, 14). In May, 2008, the Acting Chief Judge of the Washington Court of Appeals dismissed the PRP. (SCR, Exh. 15). In July 2009, the Washington Supreme Court Commissioner denied review of Mr. Young's *pro se* PRP. (SCR, Exh. 17). On September 19, 2009, the Chief Justice of the Washington Supreme Court denied Mr. Young's *pro se* motion to modify the Commissioner's ruling. (SCR, Exh. 19).

On March 21, 2008, Mr. Young petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Dkt. # 1). The Federal Public Defender's Office was appointed as counsel (Dkt. # 16), and filed an amended habeas petition in July 2008 (Dkt. # 21). Soon thereafter, the Court granted Mr. Young's unopposed motion to stay the federal habeas proceedings until after the final resolution of his state PRP. (Dkt. # 23). On October 30, 2009, the Court lifted the stay and directed respondent to answer Mr. Young's amended habeas petition. (Dkt. # 25). Mr. Young replied in January 2010 and the petition is now ready for review. (Dkt. # 29).

## DISCUSSION

### I. Standard of Review and Ineffective Assistance of Counsel

A federal court may not grant a habeas petition "on behalf of a person in custody pursuant to the judgment of a State court" unless that judgment resulted from an "unreasonable application of clearly established Federal law . . ." Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104–132, 110 Stat. 1214 (1996) (codified at 28 U.S.C. § 2254[d][1] [2006] ). Nor may a federal court grant habeas

relief merely because it disagrees with a state court's decision; rather, it may only reverse a decision that is "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). The "clearly established federal law" applicable to an ineffective assistance claim comes from *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland*, a criminal defendant receives ineffective assistance if (A) that assistance is "deficient" and (B) the deficiency "prejudices" the defense. 466 U.S. 668 at 687, 104 S.Ct. 2052. Where the state court does not reach an element of the *Strickland* test, a federal habeas court will review the issue *de novo*. *Porter v. McCollum*, — U.S. ——, 130 S.Ct. 447, 452, 175 L.Ed.2d 398 (2009). The Washington Court of Appeals found that Mr. Young failed to satisfy *Strickland's* deficiency prong, so the court did not reach the question of prejudice. Therefore, this Court reviews the state court's decision for an objectively unreasonable application of *Strickland's* deficiency prong, and reviews the prejudice issue *de novo*.

### A. *Strickland's* Deficient Performance Prong

■ Under *Strickland*, counsel's assistance is "deficient" if it "falls below an objective standard of reasonableness ... under prevailing professional norms." 466 U.S. 668 at 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674. In elaborating the deficiency standard, the Supreme Court declined to provide any "specific guidelines" or "particular requirements." *Id.* at 2065. This lack of "particulars" aside, however, *Strickland* clearly equates "reasonable" assistance with "strategic" assistance.[2]

The Court of Appeals acknowledged that defense counsel's failure to subpoena Matthew was not "strategic," but nonetheless determined that it was not deficient. The court's decision constitutes an unreasonable application of *Strickland* because (1) it depended on irrelevant factual distinctions between Mr. Young's case and one prior case; (2) it misconstrued *Strickland's* "reasonableness under prevailing professional norms"; and (3) it misapprehends the policy concerns underlying *Strickland's* prejudice prong.

### 1. The Court of Appeals Relied on Irrelevant Factual Distinctions Between Mr. Young's Case and One Prior Case.

The Report and Recommendation (R & R) finds that the Court of Appeals misapplied *Strickland* when it distinguished counsel's "single lapse"—the failure to subpoena Matthew—from the "pattern of incompetence" it deemed constitutionally deficient in *State v. Jury*, 19 Wash.App. 256, 576 P.2d 1302 (1978). (Dkt. # 31–1 at 9). According to the R & R, the state court incorrectly determined that a single error was categorically insufficient to sustain an ineffective assistance claim. *Id.* In its Objection, the State counters that the Court of Appeals did not construe *Strickland* to require a "pattern of incompetence," but "simply responded to Mr. Young's citation to *Jury* by distinguishing *Jury's* facts from Mr. Young's case." (Dkt. # 32 at 12). This claim is misleading. In his state court appeal, Mr. Young cited *Jury* to support his contention that "failure to subpoena witnesses may constitute deficient performance." *State v. Young*, 2006 WL 1064122 at *3. Rather than address that contention, the Court of

---

2. *Strickland's* majority writes: "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is*, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052 (emphasis added).

Appeals simply concluded that Mr. Young's attorney's overall conduct was "not like" defense counsel's in *Jury. Id.* The court then relied on this distinction to summarily reject Mr. Young's argument that failure to subpoena witnesses might be deficient under *Strickland.*

This summary rejection constituted an unreasonable application of *Strickland.* The Supreme Court so held, with regard to *Strickland's* prejudice prong, in *Sears v. Upton,* —— U.S. ——, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010) (state court erred when it declined to analyze prejudice because attorney had presented "some" as opposed to no mitigation evidence at sentencing). Moreover, the Washington State Supreme Court has held that a single error may render an attorney's performance constitutionally deficient. *State v. Thomas,* 109 Wash.2d 222, 743 P.2d 816 (1987) (attorney's failure to request jury instructions matching the defense's theory constituted ineffective assistance).[3] The Court of Appeals erred when it declined to analyze the alleged deficiency of counsel's conduct, solely because this conduct was "not like the pattern of incompetence in *Jury.*" (Dkt. # 32 at 12).

## 2. The Court of Appeals Misconstrued *Strickland's* "Reasonableness Under Prevailing Professional Norms."

■ As the Court of Appeals acknowledged, to show deficiency under *Strick-*

*land* a petitioner must rebut a "strong ... presum(ption) that defense counsel's conduct constituted sound trial strategy," and must do so "in light of the entire record." *State v. Young,* 2006 WL 1064122, at *3 (citing *State v. Barragan,* 102 Wash.App. 754, 9 P.3d 942 (2000); *State v. McFarland,* 127 Wash.2d 322, 899 P.2d 1251 (1995)). There is no such presumption for Mr. Young to rebut, however, since his attorney "stated on the record that his failure to serve a subpoena was not a strategy or tactic." *Young,* 2006 WL 1064122, at *4. Rather than address the ramifications of this statement, however, the court concluded that a "review of the entire record ... demonstrate(d) that ... (counsel) appeared thoroughly familiar with the facts of the case and applicable law, vigorously and skillfully cross-examined witnesses, made objections, proposed and obtained jury instructions, over the State's objection, and fully and carefully argued (Mr. Young's) case to the jury." *Id.* at *3.

In effect, the court of appeals treated counsel's *general* professionalism as a defense against allegations of *specific* deficiency, finding that the "entire record" showed him to be a competent attorney. *Id.* at *3. This Court rejected similar reasoning in *Kwan Fai Mak,* 754 F.Supp. 1490, 1501 (W.D.Wash.), aff'd, 970 F.2d 614 (9th Cir.1992) (otherwise "conscientious" and "hard working" attorneys rendered

---

3. Ninth Circuit precedent also supports Mr. Young's position. In *Alcala v. Woodford,* 334 F.3d 862, 871 (9th Cir.2003), the Ninth Circuit found an attorney's conduct deficient solely because he failed, for no strategic reason, to present either of two witnesses who could conclusively verify the defendant's alibi. The attorney relied instead on the testimony of witnesses who could only vaguely recall corroborating circumstances. The *Alcala* court held that "(w)hen defense counsel undertakes to establish an alibi, but does not present available evidence of the time or even

the date of the alibi, or offer a strategic reason for failing to do so, his actions are unreasonable." 334 F.3d at 871–72. Mr. Young's case is analogous to *Alcala.* Mr. Young's attorney undertook to establish a defense that depended entirely on Matthew's testimony, and then failed, for no strategic reason, to present Matthew as a witness. The failure led him to forego corroborating witness testimony, and it ultimately forced him to abandon the theory around which he had built Mr. Young's entire defense.

ineffective assistance when they failed, for no strategic reason, to gather mitigating evidence at sentencing).

The Court of Appeals conceded that defense counsel's failure to subpoena Matthew was not "strategic," but agreed with counsel's assertion that one ought to be able to "rely on the son testifying for his father." *Young*, 2006 WL 1064122, at *3. On this basis the court concluded that the failure to subpoena was "not necessarily unreasonable," and so did not constitute deficient conduct under *Strickland. Id.* Again, this Court rejected such reasoning in *Kwan Fai Mak*, when it acknowledged the "understandable" reasons for defense counsel's failure to mitigate, (i.e., lack of experience, language barriers, and time shortage), but still found that "the failure ... (constituted) a deprivation of the right to the effective assistance of counsel." 754 F.Supp. 1490, at 1501 aff'd, 970 F.2d 614.

■ The reasonableness of counsel's assumption that a son would voluntarily testify for his father is irrelevant to Mr. Young's ineffective assistance claim. Nowhere does *Strickland* indicate that an attorney's performance will pass constitutional muster so long as it is somehow "understandable." Rather, it requires a reviewing court to investigate the "fundamental fairness of the proceeding whose result is being challenged." 466 U.S. 668 at 696, 104 S.Ct. 2052. Under *Strickland*, defense counsel's conduct may simultaneously reflect reasonable (personal) beliefs *and* undermine the fundamental fairness of a criminal trial. The state court presumed otherwise when it denied Mr. Young's claim.

### 3. The Court of Appeals Misapprehended the Policy Concerns Underlying *Strickland's* Deficiency Standard.

In *Strickland*, the Supreme Court cautioned against creating a deficiency standard that might have a chilling effect on defense attorneys: "Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client." 466 U.S. 668 at 690, 104 S.Ct. 2052. In elaborating *Strickland's* deficiency prong, the Court sought to preserve defense counsel's autonomy, since "even the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689, 104 S.Ct. 2052. By upholding a defendant's right to counsel who will present critical witnesses, this Court will not jeopardize that autonomy. Absent a strategic justification, the failure to subpoena such witnesses reflects no professional judgment, and thus merits no deference. The trial record clearly indicates counsel's skill and preparation, but as the Supreme Court wrote in *Strickland*, "(t)he object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697, 104 S.Ct. 2052. Thus, *Strickland* affords no policy justification for rejecting Mr. Young's allegations of deficiency.

### B. *Strickland's* Prejudice Prong

■ This Court adopts the prejudice analysis in Judge Donohue's R & R in its entirety, finding that counsel's deficient performance prejudiced the outcome of Mr. Young's trial. (Dkt. # 31–1 at 10–14). This Court agrees with the R & R that Matthew's testimony had the reasonable probability of altering the outcome of Mr. Young's trial, and finds further support for this conclusion in the analysis below.

■ As discussed above, the Supreme Court explained in *Strickland* that the "benchmark for judging any claim of inef-

fectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. 668 at 686, 104 S.Ct. 2052. Ultimately, the reviewing court should focus on the "fundamental fairness" of the challenged proceeding. *Id.* at 670, 104 S.Ct. 2052. The second prong of the *Strickland* test requires that a defendant affirmatively prove that counsel's "deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. More specifically, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Reasonable probability is met where a jury "would have a reasonable doubt respecting guilt," absent counsel's errors. *Id.* at 695, 104 S.Ct. 2052.

Since the state court determined that Mr. Young's defense counsel was not deficient, it did not reach the prejudice prong of *Strickland.* Where the state court does not decide one element of the *Strickland* test, that element is reviewed de novo. *Porter,* 130 S.Ct. at 452.

■ Ineffective assistance of counsel claims must be analyzed case-by-case, based on the totality of the evidence. *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052. While refusing to identify specific prejudicial attorney behavior, the Supreme Court acknowledged that some attorney errors will have only an "isolated, trivial effect," while others will have a "pervasive effect ... altering the entire evidentiary picture." *Id.* at 695–96, 104 S.Ct. 2052. Numerous lower courts have found prejudice in cases where attorney error resulted in a significantly skewed "evidentiary picture," leaving the defendant with no effective defense. *See Luna v. Cambra,* 306 F.3d 954, 961, 966 (9th Cir.2002), *amended by Luna v. Cambra,* 311 F.3d 928 (9th Cir. 2002) (counsel's failure to interview and subpoena alibi witnesses left defendant's alibi uncorroborated, prejudicing the outcome of the trial); *Brown v. Myers,* 137 F.3d 1154, 1157 (9th Cir.1998) (missing alibi witness testimony would have "altered significantly the evidentiary posture of the case ... [and] the jury would have had to balance more evenly divided evidence to reach its verdict"); *Sanders v. Ratelle,* 21 F.3d 1446, 1461 (9th Cir.1994) (defense counsel's failure to investigate and present confession of third party "must certainly undermine one's confidence in the murder conviction ... [and] served to deprive [the defendant] of the most critical evidence supporting his best defense"); *see also Goodman v. Bertrand,* 467 F.3d 1022, 1024, 1030 (7th Cir.2006) (testimony from a disinterested eyewitness, who defense counsel failed to subpoena, was "undoubtedly important to creating reasonable doubt in the state's case" against the defendant). In sum, where counsel error leaves a defendant without any real or effective defense, courts find prejudice, satisfying the second prong of *Strickland.*

The state argues that the R & R failed to take into account the totality of evidence presented in Mr. Young's trial, as required by *Strickland,* 466 U.S. at 669, 104 S.Ct. 2052. In particular, the state points to witness testimony from Tuohy's girlfriend Amy Wyatt, who recalled meeting Mr. Young on a previous drug deal. The prosecution also introduced evidence of a map drawn in dust on Mr. Young's car, apparently depicting the intersection near the Denny's where Tuohy was shot. The state is correct that the R & R did not discuss this evidence. However, the additional evidence only serves to implicate Mr. Young

as an accomplice to a crime, not specifically to a robbery. Reasons other than planning a robbery could explain the map in the dust. Furthermore, Ms. Wyatt's testimony actually corroborates the drug deal theory. However, since Matthew and Mr. Ruth did not testify, the second-degree felony murder charge based on the drug-deal-gone-bad theory was dropped. The jury was only instructed on first-degree murder based on the robbery theory. As a result, defense counsel was stuck trying to persuade the jury that Mr. Young was not an accomplice to any crime, leaving Mr. Young without a credible or effective defense.

The state also argues that Matthew's testimony would not have altered the outcome of Mr. Young's trial, since the defense was badly constrained by Mr. Young's self-incriminating confession. However, as the R & R discusses, Matthew's testimony was sufficient to secure his own acquittal of first-degree murder. In addition, Mr. Ruth's corroboration would bolster Matthew's testimony and significantly undermine Howe's version of events, leaving a "reasonable probability" that the outcome of Mr. Young's trial would be different but for counsel's error. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. *See also Goodman*, 467 F.3d at 1030 ("Where the state's case consists chiefly or solely upon the word of an accomplice . . . courts have recognized the great importance to the defendant of evidence of direct contradiction or material corroboration from other sources."). The absence of Matthew's testimony deprived Mr. Young of the "most critical evidence supporting his best defense," altering the "entire evidentiary picture." *Sanders*, 21 F.3d at 1461; *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052. This unbalanced evidentiary picture "undermine[s] confidence in the outcome" of Mr. Young's trial. *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. The state

insists that Young's confession, not Matthew's testimony, was the critical difference between the two trials. The critical difference was that Mr. Young was left without any effective defense because counsel failed to subpoena the most important defense witness.

In his attached declaration, Matthew verifies that he would have appeared for Mr. Young's trial had he been subpoenaed. (Dkt. # 29–2 at 2). The state contends that this declaration is not credible because Matthew did not voluntarily appear for this father. However, if subpoenaed, Matthew would have been legally obligated to appear to testify, and could have been held in contempt had he failed to appear. This is substantially different from offering testimony voluntarily. *See R & R* (Dkt. # 31–1 at 12–13).

The state also asserts that Matthew may have invoked the Fifth Amendment and refused to testify, "based on potentially being charged with perjury if he had made a material misrepresentation during his prior testimony during his own trial." (Dkt. # 32–1 at 2). The state cites no relevant authority to support this argument. The Court finds this argument speculative and unpersuasive, since Matthew warranted in his declaration that had he testified at Mr. Young's trial, he would have provided the same facts regarding the incident as he did at his own trial. (Dkt. # 29–2 at 2).

Given the absence of critical defense testimony and the relative conviction of accomplices, Mr. Young's "trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052. Had counsel subpoenaed Matthew, the jury would have been presented with a more balanced evidentiary picture. As a result, there is a reasonable probability that the jury "would have reasonable

doubt respecting" Mr. Young's involvement in a robbery. *Id.* at 695, 104 S.Ct. 2052. Defense counsel's deficient performance prejudiced the outcome of Mr. Young's trial, satisfying the second prong of *Strickland.* Mr. Young was denied his Sixth Amendment right to effective assistance of counsel.

## CONCLUSION

The jury lost the opportunity to consider that the victim died as part of a drug deal gone bad, which would have supported a conviction for second-degree murder, rather than in the course of a robbery, which supported Mr. Young's conviction for first-degree murder. Mr. Young's attorney provided him ineffective assistance of counsel in violation of the Sixth Amendment by failing to subpoena Matthew to testify. The state-court adjudication to the contrary constituted an objectively unreasonable application of Supreme Court authority. As such, this Court ADOPTS the Report and Recommendation of Magistrate Judge James P. Donohue, GRANTS Mr. Young's petition for writ of habeas corpus, and VACATES his conviction for first-degree murder. Petitioner should be released from custody unless the State of Washington commences proceedings to retry him within ninety (90) days after the entry of this order. (Dkt. # 31–1 at 14).

The Clerk of Court is directed to send a copy of this Order to Magistrate Judge James P. Donohue.